Court Of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# OPINION

No. 04-07-00234-CV

**MERCK & CO., INC.**,
Appellant

v.

Felicia **GARZA**, Individually and on Behalf of The Estate of Leonel Garza, Sr.,
Leonel Garza, Jr., Luis Jamie Garza, and Lauro Guadalupe Garza,
as Heirs to The Estate of Leonel Garza, Sr.,
Appellees

From the 229th Judicial District Court, Starr County, Texas
Trial Court No. DC-03-84
Honorable Alex Gabert, Judge Presiding

Opinion by:    Sandee Bryan Marion, Justice

Sitting:    Catherine Stone, Justice
Sandee Bryan Marion, Justice
Phylis J. Speedlin, Justice

Delivered and Filed:    December 10, 2008

REVERSED AND RENDERED IN PART, REVERSED AND REMANDED IN PART

In an opinion and judgment dated May 14, 2008, we reversed the trial court's judgment and

rendered a take-nothing judgment in favor of appellant. Appellees, who were the plaintiffs below,

filed a motion for rehearing. We vacate our earlier judgment, withdraw our earlier opinion, and issue

this opinion and judgment in their place. Although we grant appellees' motion for rehearing, we

reverse the judgment in their favor on their design defect claim and render a take-nothing judgment

on that claim. Because of juror misconduct, we reverse the trial court's judgment in all other respects and remand for further proceedings.

## BACKGROUND

At the time of his death on April 21, 2001, Leonel Garza was seventy-one years old and had a history of heart problems. On March 27, 2001, Mr. Garza visited his cardiologist, Dr. Michael Evans, because he had been experiencing "[i]ntermittent numbness, left arm pain and weakness that had started the day before and was occurring on and off over a 24-hour period." During this visit, Dr. Evans gave Mr. Garza a one-week sample supply of Vioxx to ease the pain in his arm. This was the first time Mr. Garza had taken Vioxx. Following his appointment with Dr. Evans, Mr. Garza underwent several tests, including an ultrasound of his neck to check blood circulation in the brain and a cardiolite stress test to check blood flow in the heart. On April 4, 2001, Mr. Garza returned to the doctor for the test results, this time seeing Dr. Evans' partner, Dr. Juan Posada. Because Mr. Garza's stress test showed a "mild abnormality," Dr. Posada recommended a cardiac catheterization, which Mr. Garza declined pending his next appointment with Dr. Evans. Although Dr. Posada does not recall giving Mr. Garza more Vioxx, Mr. Garza's wife testified that he did. On April 21, 2001, Mr. Garza died of a heart attack. Mrs. Garza and the Garzas' children (collectively, "the plaintiffs") sued Merck & Co., Inc. on design defect and marketing defect strict liability claims based upon allegations that Merck's prescription drug Vioxx caused Mr. Garza's death. This is an appeal from a jury verdict in favor of the plaintiffs.

On appeal, Merck raises a number of complaints, including challenges to the sufficiency of the evidence on causation, whether the plaintiffs' state law tort claims are preempted by federal law,

and whether jury misconduct occurred. We conclude the trial court's judgment must be reversed because we believe jury misconduct occurred, thus warranting a remand of this cause. Because we remand for further proceedings we do not address Merck's challenges to the factual sufficiency of the evidence in support of the jury's verdict. However, because we are required to address all issues that may require us to render in favor of either party, we will address Merck's challenges to the legal sufficiency of the evidence supporting the verdict on the plaintiffs' marketing defect and design defect claims, as well as Merck's preemption argument.

## CAUSATION

In its first issue, Merck asserts the plaintiffs did not present legally sufficient evidence of a causal link between Mr. Garza's use of Vioxx and his fatal heart attack. Under both their marketing defect and design defect claims, plaintiffs were required to prove both general and specific causation. *See Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 714-15 (Tex. 1997). General causation asks whether a substance is capable of causing a particular injury in the general population; specific causation asks whether that substance caused a particular individual's injury. *Id.*

### A. General Causation

On appeal, Merck insists the evidence is legally insufficient because the plaintiffs did not introduce into evidence at least two statistically significant scientific studies showing Vioxx at the same dose and duration as taken by Mr. Garza more than doubled the risk of heart attack. According to Merck, *Havner* requires experts to base their causation opinions on reliable epidemiological or other scientific evidence when, as here, there is no direct experimental evidence of causation. Merck views *Havner* as requiring that epidemiological studies show more than a doubling of the risk and

that any study relied upon by a causation expert be statistically significant; *i.e.*, the study must have a confidence level of ninety-five percent that does not include a value of 1.0 or below. We do not construe *Havner* as narrowly as Merck, nor do we believe *Havner* established such a bright-line test for causation. Instead, the *Havner* Court "emphasize[d] that courts must make a determination of reliability from all the evidence." *Id.* at 720. The Court "[drew] no conclusions . . . other than to point out that there are a number of reasons why reliance on a relative risk of 2.0 as a bright-line boundary would not be in accordance with sound scientific methodology in some cases. Careful exploration and explication of what is reliable scientific methodology in a given context is necessary." *Id.* at 719. "Courts should allow a party, plaintiff or defendant, to present the best available evidence, assuming it passes muster under *Robinson*, and only then should a court determine from a totality of the evidence, considering all factors affecting the reliability of particular studies, whether there is legally sufficient evidence to support a judgment." *Id.* at 720. In this case, plaintiffs relied on clinical trials to establish causation. We therefore follow *Havner's* mandate to determine from a totality of the evidence whether there is legally sufficient evidence to support the jury's implied finding on general causation.

On appeal, Merck concedes clinical trials "are considered the best type of epidemiological evidence for determining the relationship between an agent and a disease or health outcome." At trial, the head of Merck's Department of Epidemiology, whom the plaintiffs called as an adverse witness, characterized clinical trials as "much more powerful that an epidemiology study." As to the clinical trials conducted with Vioxx, plaintiffs offered the deposition testimony of Dr. Eric Topol, who was subpoenaed for the deposition and did not serve as an expert for either party. Dr.

Topol explained that Merck conducted several clinical trials for the purpose of extending Vioxx into new areas, such as prevention of colon polyps and prostate cancer, and to identify stomach problems. Although these studies excluded patients with cardiac conditions, Dr. Topol said the results of the studies indicated a more than two-fold risk of serious cardiovascular "adverse experiences" suffered by the people who participated in the studies. He said these adverse effects had been replicated in four other randomized clinical trials. In each trial, the cardiac adverse effect manifested itself within twelve weeks or less of taking Vioxx. Dr. Topol summed up his concerns about Vioxx as follows: "But given all these things - - that is, statistical power, lack of cardiovascular patients, and four randomized trials . . . there's a pretty strong case that the risk of Vioxx for heart attacks can occur at any time after the initiation of the medicine." In 2004, Merck decided to withdraw Vioxx from the market based on the results of another clinical study that showed "an increase in cardiovascular events that was statistically significant [within 36 months]."

To establish general causation, the plaintiffs were required to show that Vioxx is a substance capable of causing a particular injury in the general population. After reviewing the evidence and considering the appropriate standard of review for a legal sufficiency challenge, we conclude the plaintiffs carried their burden of presenting legally sufficient evidence to support a finding of general causation.

**B.    Specific causation**

To establish specific causation, plaintiffs may rely on studies showing an increased risk of their particular injury resulting from exposure to the substance at issue to raise a fact question on causation. *Havner*, 953 S.W.2d at 714-15. However, "if there are other plausible causes of the

injury or condition that could be negated, the plaintiff must offer evidence excluding those causes with reasonable certainty." *Id.* at 720 (citation omitted). On appeal, Merck focuses its argument on a single complaint: that the plaintiffs' evidence on specific causation is insufficient because plaintiffs' expert, Dr. Simonini, did not rule out, with reasonable certainty, the most plausible cause of Mr. Garza's heart attack, which was the progression of his preexisting cardiovascular disease.

At trial, Dr. Simonini conceded Mr. Garza had cardiac problems and was a "high-risk patient." Mr. Garza was seventy-one years old and overweight; he had already suffered one heart attack; he had had quadruple bypass surgery sixteen years before his death; he had high blood pressure and high cholesterol; and he had some diseased arteries. He had been smoking as much as two packs a day for almost forty years, and continued to smoke until his death but had decreased to only two or three cigarettes a day. Dr. Simonini admitted that continuing to smoke puts one at risk, even someone like Mr. Garza who was taking blood pressure and cholesterol medication, and smoking may reduce the benefits of any such medication. Dr. Simonini also conceded that the type of heart disease Mr. Garza had put him at risk for having another heart attack. Mr. Garza's autopsy revealed the "aorta shows stress of severe atherosclerotic disease," "extensive scarring and old fibrosis along the posterior lateral and anterior lateral segments of the heart and also along the ventricular septum," "severe atherosclerotic diseases of all coronaries," and "the bypass graft shows severe disease."

Despite Mr. Garza's history of heart problems, plaintiffs contend they excluded, with reasonable certainty, the possibility that his fatal heart attack was caused by his preexisting heart condition by establishing the following: Mr. Garza's two physical examinations, between March 27

and April 4 of 2001, showed him to have "stable cardiac status" before he began taking Vioxx; his death was caused by two fresh occlusions (or clots) that occurred after he began taking Vioxx; the simultaneous formation of two clots is very rare without the introduction of a causative agent like Vioxx; and the formation of clots is the type of problem caused by Vioxx.

As support for their contention that Mr. Garza's heart condition was stable, plaintiffs point to Dr. Posada's notes following his April 4, 2001 examination of Mr. Garza in which he stated "stable cardiac status . . . ." The result of Mr. Garza's stress test revealed the tip of Mr. Garza's heart did not get enough blood flow. However, Dr. Simonini noted this was "a very small area of the heart, and it was stable from [a previous test]." Dr. Simonini explained that the stress test revealed Mr. Garza's heart had only a "mild abnormality." Dr. Simonini said that sixty percent of Mr. Garza's heart emptied every time the heart squeezed and this fraction was within normal range and was a "good predictor of staying alive longer." Dr. Simonini characterized Mr. Garza's blood pressure as "good" and under control and his "bad" cholesterol was down, all because he was taking medication to control his blood pressure and cholesterol levels.

Plaintiffs also relied on Mr. Garza's autopsy, which revealed that Mr. Garza's heart attack was caused by the simultaneous formation of two clots in two of Mr. Garza's vein graphs from his bypass surgery. Plaintiffs contrast the autopsy results with the results of the stress test that showed blood flow to these same areas was good and there was no evidence of blockage. According to Dr. Simonini, the simultaneous formation of the two clots in two different arteries was a "rare" occurrence, and it would be difficult to explain why Mr. Garza suffered a heart attack within a few weeks of his stress test absent his taking Vioxx. However, if his taking Vioxx was added to the

scenario, Dr. Simonini opined "then you have a causative effect" because "[y]ou have something that has been shown to cause clots, and now you could explain this – this simultaneous event of two vessels being blocked . . . at the same time."

As part of their burden on specific causation, the plaintiffs were required to offer evidence excluding other causes of Mr. Garza's heart attack with reasonable certainty. We cannot conclude that Dr. Simonini's causation opinion, premised on Mr. Garza's "stable cardiac status" and the "rare" formation of the two blood clots, was little more than speculation or amounted to no evidence on this issue. Therefore, after reviewing the evidence and considering the appropriate standard of review for a legal sufficiency challenge, we conclude the plaintiffs carried their burden of presenting legally sufficient evidence to support a finding of specific causation.

**MARKETING DEFECT**

Merck also asserts the plaintiffs failed to offer legally sufficient evidence that Mr. Garza would not have taken Vioxx had Merck provided a different warning. In a marketing defect case, a manufacturer is liable to a plaintiff if its failure to warn renders a product unreasonably dangerous and the manufacturer's failure to warn was a producing cause of injury to the plaintiff. *See Goodyear Tire & Rubber Co. v. Rios,* 143 S.W.3d 107, 116 (Tex. App.—San Antonio 2004, pet. denied). In cases of prescription drugs, the manufacturer is excused from warning each patient who receives the drug if the manufacturer properly warns the prescribing physician of the dangerous propensities of its product. *Alm v. Aluminum Co. of Am.,* 717 S.W.2d 588, 591 (Tex. 1986). The doctor stands as a learned intermediary between the manufacturer and the ultimate consumer. *Id.* In a failure to warn case governed by the learned intermediary doctrine, even if we assume the

plaintiff can prove that the given warnings were inadequate, the plaintiff still must prove causation. In order to prove causation, the plaintiff must show that a proper warning would have changed the decision of the intermediary to prescribe the product. *See Stewart v. Janssen Pharmaceutica, Inc.,* 780 S.W.2d 910, 912 (Tex. App.—El Paso 1989, writ denied).

Merck contends plaintiffs were required to show a proper warning would have changed Dr. Evans's decision to give Vioxx to Mr. Garza. Dr. Evans testified he kept himself apprised of the medical literature regarding Vioxx and he was aware of the VIGOR[1] data when he gave the samples to Mr. Garza. He stated he did not rely on information obtained from Merck employees or pharmaceutical sales representatives, and knowing what he knows today he would still provide Vioxx to his high-risk heart patients for a period of two months. Because Dr. Evans said he would continue to prescribe Vioxx today, Merck contends the plaintiffs failed to prove that its failure to warn was the cause of Mr. Garza's injuries.

Plaintiffs counter that they had to show a proper warning would have changed Dr. Posada's decision to give Vioxx to Mr. Garza because, while Dr. Evans gave Mr. Garza only a one-week supply, Dr. Posada gave him a thirty-day supply, which Mr. Garza took for the seventeen days leading up to his death. Plaintiffs argue that if an adequate warning would have prevented Dr. Posada from continuing the course of treatment begun by Dr. Evans, then the failure to adequately warn Dr. Posada would be the proximate cause of Mr. Garza's death. We agree with the plaintiffs.

---

[1] VIGOR is one of three studies relied upon by Dr. Simonini to support his opinion that Vioxx caused Mr. Garza's death. VIGOR is a nine-month clinical trial conducted by Merck involving a dosage of 50 milligrams of the drug. VIGOR compared 50mg of Vioxx to 1000mg of naproxen in patients with rheumatoid arthritis. The Vioxx users reported half as many stomach perforations, stomach bleeds, and ulcers as the naproxen users. However, the naproxen users experienced about half as many thrombotic cardiovascular events. Naproxen users also experienced fewer heart attacks. Mr. Garza took 25 milligrams of Vioxx.

Dr. Posada stated he saw Mr. Garza only once, on April 4, 2001. Based on his assessment of Mr. Garza and based on what Mr. Garza told him, Dr. Posada decided not to change any of the medications taken by Mr. Garza. Dr. Posada could not remember whether he gave Mr. Garza more Vioxx, and no mention is made of him doing so in his notes. At trial, Dr. Posada was asked the following:

> Doctor, knowing what you know now about the effects of Vioxx and its propensity to cause clots, realizing it's been withdrawn and you couldn't prescribe it or give samples of it now, if you had known back then in 2001 what you know now, would any reasonable and prudent physician, including yourself, have provided Vioxx to a patient like Mr. Garza?

Dr. Posada responded: "No, sir." Dr. Posada was later asked what he knew, or did not know, in 2001 about Vioxx, and he responded he could not recall.

After reviewing this evidence and considering the appropriate standard of review for a legal sufficiency challenge, we conclude Dr. Posada's answer is legally sufficient evidence to support the jury's implied finding that a proper warning would have changed his decision to prescribe Vioxx.

## FEDERAL PREEMPTION

Merck contends it is entitled to judgment on plaintiffs' marketing claim because it complied with the FDA's regulations for the marketing and sale of Vioxx. Federal law preempts state law when "Congressional intent to preempt may be inferred from the existence of a pervasive federal regulatory scheme." *AT&T Corp. v. Pub. Util. Comm'n of Tex.*, 373 F.3d 641, 645 (5th Cir. 2004). Merck contends that because the regulation of prescription drugs is "pervasive and complete," federal law, and not state law, governs when changes can be made to a prescription drug's labeling. Thus, as to the plaintiffs' marketing defect claim, Merck contends it could not have changed its Vioxx label without prior FDA approval. According to Merck, the FDA approved Vioxx as "safe

and effective" for various uses and this finding conflicts with the jury finding. Plaintiffs counter that Merck is relying on language in the preamble to the FDA labeling regulations and Merck's argument has been rejected by the federal multidistrict litigation court and most other courts.

This issue was addressed by the federal district court hearing the multidistrict litigation involving all federal cases in which Merck has been sued based on claims arising from the use of Vioxx. *See In re Vioxx Prod. Liab. Litig.*, 501 F. Supp. 2d 776 (E.D. La. 2007). That court held as follows:

> When analyzed with these factors in mind, the Court cannot defer to the FDA in the instant cases because the agency's statements on preemption in the preamble to the 2006 Final Rule lack the "power to persuade." Until January 24, 2006, the FDA itself had consistently recognized that state-law claims could coexist with federal regulation of prescription drugs: "FDA does not believe that the evolution of state tort law will cause the developments of standards that would be at odds with the agency's regulations." Indeed, the FDA's current position on preemption represents a significant departure from well-settled administrative and judicial views on the issue, and ultimately is both unpersuasive and untenable in this multidistrict litigation.
>
> In the preamble to the 2006 Final Rule, the FDA announces that it is the "expert Federal agency responsible for evaluating and regulating drugs." While this is certainly true, historically, "the several States have [also] exercised their police powers to protect the health and safety of their citizens." Because there are no federal remedies for individuals harmed by prescription drugs, a finding of implied preemption in these cases would abolish state-law remedies and would, in effect, render legally impotent those who sustain injuries from defective prescription drugs. To take such drastic action based solely on a preamble inserted at the eleventh hour and drafted by an agency without the express or implied authority to abolish such remedies is Draconian and unacceptable. "If Congress had intended to deprive injured parties of a long available form of compensation, it surely would have expressed that intent more clearly." Far from standing "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," state-law claims against prescription drug manufacturers "necessarily perform an important remedial role in compensating" injured individuals. Following longstanding and well-reasoned precedent, the Court concludes that there is no actual conflict between the plaintiffs' state-law claims against Merck and federal law. Therefore, preemption of state law is inappropriate.

*Id.* at 788 (citations omitted).

In light of the above analysis, we hold that the plaintiffs' claims here are not preempted by federal law.[2] *See also Riegel v. Medtronic, Inc.*, 128 S. Ct. 999, 1019 (2008) (Ginsburg, J., dissenting) ("Decades of drug regulation thus indicate . . . that Congress did not regard FDA regulation and state tort claims as mutually exclusive.").

## DESIGN DEFECT

Merck asserts the evidence supporting plaintiffs' design defect claim is legally insufficient because plaintiffs presented no evidence of a feasible alternative design. We agree. To establish a design defect, a plaintiff must prove that a safer alternative design exists that would substantially reduce the risk of injury and be economically and technologically feasible. TEX. CIV. PRAC. & REM. CODE ANN. § 82.005(a) (Vernon 2005); *Gen. Motors Corp. v. Sanchez*, 997 S.W.2d 584, 588 (Tex. 1999).

The only proof of a safer alternative design offered by plaintiffs was a patent application for a pain-relief drug designed by Merck that combines the gastro-protective qualities of Vioxx with the cardio-protective qualitites of aspirin. Plaintiffs rely on the patent application[3] for the new drug as circumstantial evidence of technological and economical feasibility. From this patent application, the jury was required to draw two inferences: (1) that the proposed new drug was scientifically

---

[2] We are aware that the United States Supreme Court heard oral arguments on November 3, 2008 in *Wyeth v. Levine*, No. 06-1249, in which the question presented was "Whether the prescription drug labeling judgments imposed on manufacturers by the Food and Drug Administration ("FDA") pursuant to [the] FDA's comprehensive safety and efficacy authority under the Federal Food, Drug, and Cosmetic Act . . . preempt state law product liability claims premised on the theory that different labeling judgments were necessary to make drugs reasonably safe for use."

[3] The purpose of a patent grant "is to provide an incentive for private enterprise to devote resources to innovative research, to make the investments required to put new inventions into practice, and to make the benefits of the invention available to a wider public." *Mannington Mills v. Congoleum Indus., Inc.*, 610 F.2d 1059, 1070 (3rd Cir. 1979). A patent defines and gives public notice of the patent holder's exclusive rights in the claimed invention so as to exclude other inventors and competitors from making, using or selling the invention. *King Indus. Corp. v. Perego*, 65 F.3d 941, 947 (Fed. Cir. 1995).

feasible and (2) Merck would not go to the expense of an international patent application if it had not determined that such a drug was economically feasible.

"Even if evidence is undisputed, it is the province of the jury to draw from it whatever inferences they wish, so long as more than one is possible and the jury must not simply guess." *City of Keller v. Wilson*, 168 S.W.3d 802, 821 (Tex. 2005). "In claims or defenses supported only by meager circumstantial evidence, the evidence does not rise above a scintilla (and thus is legally insufficient) if jurors would have to guess whether a vital fact exists." *Id.* at 813. "The equal inference rule provides that a jury may not reasonably infer an ultimate fact from meager circumstantial evidence 'which could give rise to any number of inferences, none more probable than another.'" *Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)). "Thus, in cases with only slight circumstantial evidence, something else must be found in the record to corroborate the probability of the fact's existence or non-existence." *Id.*

Here, the plaintiffs presented only an application for a patent, which amounts to "only slight circumstantial evidence." Therefore, "something else must be found in the record to corroborate the probability of the fact's existence or non-existence." *Id.* There is nothing else in the record here to corroborate the probability that this new drug is a technologically and economically feasible alternative to Vioxx. Accordingly, we conclude plaintiffs' design defect claim fails as a matter of law.

## JURY MISCONDUCT

Following the jury's verdict, Merck discovered that one of the jurors, Jose Manuel Rios, had received loans of money from Mrs. Garza. Mrs. Garza made seven interest-free loans to Rios, totaling $12,700, over a six-year period beginning in July 2000. Voir dire in the underlying lawsuit

commenced on January 24, 2006. The last loan, for $2,500, was made in July 2005, just six months before trial. Also, following the verdict, Merck discovered several calls from Rios's cell phone to Mrs. Garza's telephone: one within days of Rios's receipt of the jury summons; another the night before jury selection; and four calls on the day after Merck filed a post-trial motion to take Rios's deposition. Rios voted with the 10-2 majority in rendering a verdict against Merck. On appeal, Merck complains the trial court erred in denying its motion for new trial based upon juror misconduct.

We review a trial court's ruling on a motion for new trial for an abuse of discretion. *Chavarria v. Valley Transit Co.*, 75 S.W.3d 107, 110 (Tex. App.—San Antonio 2002, no pet.). A new trial for jury misconduct is warranted if (1) the misconduct occurred, (2) it was material, and (3) probably caused injury. TEX. R. CIV. P. 327(a); *Golden Eagle Archery, Inc. v. Jackson*, 24 S.W.3d 362, 372 (Tex. 2000).

Here, Rios did not reveal his financial relationship with Mrs. Garza during voir dire. When asked on voir dire how he knew Mrs. Garza, he replied: "from school."[4] When asked if his knowing her would affect his ability to be fair and impartial, Rios responded in the negative. When asked if he would be uncomfortable seeing Mrs. Garza in the future if he decided Merck was not liable, Rios again responded in the negative. However, in his post-trial deposition, a copy of which was attached to Merck's motion for new trial, Rios admitted he obtained interest-free loans from Mrs. Garza and he performed no services in exchange for the loans. The loans were always in the amount he requested. Rios's bank statements obtained during post-trial discovery reveal he was in financial distress from December 21, 2005 to February 16, 2006, the time period during which he would have received his jury summons and participated in voir dire. On November 23, 2005, the Rioses received

---

[4] Both Rios and Mrs. Garza work for the Rio Grande City public schools.

notice to vacate their house because they had not been able to secure financing to pay off the amount owed on the house. Rios admitted in his deposition that he often needed the loans to pay his bills. Rios explained that most of the telephone calls from his cell phone to Mrs. Garza were made by his wife.

Rios had a personal financial relationship with Mrs. Garza, but when asked in voir dire how he knew her, Rios merely replied "from school." Also, Mrs. Garza's eve of trial communications with either Rios or his wife were not revealed to Merck. This is clearly a relationship that was more than simply "from school." Litigants are entitled to an unbiased jury. *See Kennard v. Kennard*, 26 S.W.2d 336, 337 (Tex. Civ. App.—Waco 1930, writ ref'd). Rios's less than forthright answer left a false impression about how he knew Mrs. Garza and the extent of their relationship. We conclude Rios's failure to disclose his financial relationship with Mrs. Garza amounted to misconduct. Even assuming Rios's silence regarding his financial relationship with Mrs. Garza was innocent, "it is impossible to say that injury to the defendant did not result from it." *See Gulf, C. & S.F. Ry. Co. v. Matthews*, 28 Tex. Civ. App. 92, 66 S.W. 588, 592 (Dallas, 1902). Because Rios voted with the majority on the 10-2 verdict, Merck was harmed by this conduct. *See Tex. Milk Prod. Co. v. Birtcher*, 157 S.W.2d 633, 635 (Tex. 1941) ("[T]he mind of the juror, without intending any harm, might well have been unconsciously turned in the direction of those who had thus consistently favored him upon the three occasions in question."). Therefore, on this record, we must conclude the trial court erred in denying Merck's motion for new trial.

# CONCLUSION

We reverse the judgment in favor of the plaintiffs on their design defect claim and render a take-nothing judgment on that claim in favor of Merck.  In all other respects we reverse the trial court's judgment and remand for further proceedings.[5]

Sandee Bryan Marion, Justice

---

[5] We decline to address Merck's remaining issues or the issues raised by the plaintiffs in their cross-appeal because they are not dispositive to this appeal.  TEX. R. APP. P. 47.1.