# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
November 7, 2023

Lyle W. Cayce
Clerk

————————

No. 22-40790

————————

Su Min Kim; Ji Hun Kim,

*Plaintiffs—Appellees*,

*versus*

American Honda Motor Company, Incorporated,

*Defendant—Appellant*.

———————————————————————

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:19-CV-332

———————————————————————

Before Higginbotham, Smith, and Elrod, *Circuit Judges*.
Patrick E. Higginbotham, *Circuit Judge*:

Su Min Kim and Ji Hun Kim ("the Kims") were injured in a side-impact car accident in a 2014 Honda CR-V and sued American Honda Motor Company, Inc., asserting strict liability and negligence defective design product liability claims. A jury found Honda liable and found $21,430,808.74 in damages. After apportioning, the court awarded the Kims nearly $5 million.

In the course of litigation, Honda moved to exclude Plaintiffs' two liability experts, moved for a new trial and a judgment as a matter of law

No. 22-40790

("JMOL"), and objected to the want of a jury instruction regarding a presumption of nonliability ("the presumption"). On appeal, Honda argues the district court erred in denying the motions and rejecting the requested instruction. We AFFIRM.

## I.

### A.

On June 30, 2018, 17-year-old Ji Hun Kim was driving a 2014 Honda CR-V in an eastbound direction on Warren Parkway in Frisco, Texas, with his 20-year-old sister, Su Min Kim, in the front passenger seat. At the same time, Trae Michael Hubbard was driving northbound on Dallas Parkway. As Ji Hun drove through the intersection of Warren Parkway and Dallas Parkway at a speed of approximately 34 mph, Hubbard ran a red light, driving into the intersection traveling 45–50 mph and T-boning the front passenger side of the Kims' CR-V.[1]

Ji Hun suffered only a minor concussion, but Su Min was seriously injured. Her skull was crushed, and she sustained permanent injuries to her brain, skull, face, and left eye that have left her unable to live independently.

The force of the collision caused Ji Hun's upper body to move to the right, toward the impact on the passenger side. He rolled out of the shoulder belt portion of his seatbelt, which crossed over his left shoulder, and his head intruded into the passenger space. At the same time, Su Min moved to the left, rebounding after hitting the side airbags. Consequently, the right side of Ji Hun's head struck the left side of Su Min's head.

---

[1] There was a third vehicle involved in the crash, but it did not cause any of the injuries at issue and is not relevant to this litigation.

This injury is typed as a "far-side impact injury," which Honda's engineer and corporate representative defined as "occur[ing] when the occupant on the other side of the impact hits something inside the vehicle on the side where the impact occurred." That is, Su Min's injury did not result directly from being hit by Hubbard's car. It occurred because the accident caused Ji Hun to slip out of his seatbelt and crash his head against Su Min's head.

At trial, Plaintiffs' expert Neil Hannemann explained that the crash should have been "a survivable accident without serious injury" because the "configuration and severity" of the accident were below the parameters of testing by the Insurance Institute for Highway Safety. However, Hannemann said, and Honda's corporate representative admitted, that "prior to the manufacturing of the 2014 Honda CR-V," Honda did not "run a side impact test with a far side crash test dummy in the test vehicle."

**B.**

On May 7, 2019, the Kims filed a product liability design defect lawsuit against Honda, bringing both strict liability and negligence claims. They sought damages for, *inter alia*, emotional distress, medical expenses, physical pain and suffering, physical and mental impairment, and lost earnings capacity. They argued Honda could have used either of two alternative, extant designs that would have prevented Su Min's injuries: a center airbag or a reverse geometry seatbelt.

Honda moved to exclude the testimony of Plaintiffs' two experts: Dr. Mariusz Ziejewski, a biomechanical engineer and accident reconstructionist, and Neil Hannemann, an automotive engineer. The Kims sought to offer their opinion of how the accident occurred, how Su Min sustained her injuries, and whether the center airbag or reverse geometry seatbelt designs would have likely prevented them. After a *Daubert* hearing, the district court

denied both motions, concluding that Honda's challenges to Ziejewski's and Hannemann's opinions went to their weight, not their admissibility.[2]

At trial, Honda requested a jury instruction pursuant to Texas Civil Practice and Remedies Code § 82.008, which provides a rebuttable presumption of nonliability to manufacturers and sellers in product liability actions if they complied with federal regulations that govern the product risk that allegedly caused the harm.[3] Honda posited that the relevant product risk was "the risk of injury in a side-impact collision," and that there was a federal standard with which Honda complied that governed the risk. But the district court rejected Honda's definition of product risk, opting instead for a more case-specific one: "the risk of injury from a far-side impact during a near-side collision." Because there was no federal standard governing that product risk, the district court denied Honda's requested instruction.

The jury found Honda liable for a defective design and awarded Su Min $21,180,808.74 and Ji Hun $250,000. After the jury assigned 77% of the responsibility to Hubbard (the driver of the other car) and the court adjusted the award in its final judgment, Honda owed Su Min $4,871,586.01 and Ji Hun $57,500.

After trial, Honda filed a renewed motion for a JMOL and a motion for a new trial, raising numerous grounds for relief. The district court denied these motions in a 61-page published opinion.

---

[2] *See generally Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). These asserted errors were preserved under Federal Rule of Evidence 103(b). FED. R. EVID. 103(b) ("Once the court rules definitively on the record—either before or at trial—a party need not renew an objection or offer of proof to preserve a claim of error for appeal.").

[3] TEX. CIV. PRAC. & REM. CODE § 82.008(a).

No. 22-40790

Honda reiterates most of these arguments on appeal: that (1) the district court abused its discretion by denying Honda's motions to exclude Plaintiffs' experts; (2) the district court erred by denying Honda's JMOL motion; and (3) the district court erred by ruling the nonliability presumption did not apply and, therefore, not instructing the jury about the presumption.

## II.

The district court had jurisdiction over this diversity case under 28 U.S.C. § 1332(a),[4] and there is no challenge to the application of Texas law in this case. This Court has jurisdiction over the district court's final judgment pursuant to 28 U.S.C. § 1291.

We review a district court's decision to admit or exclude expert testimony "for an abuse of discretion,"[5] accepting that "[d]istrict courts enjoy wide latitude in determining the admissibility of expert testimony, and the discretion of the trial judge and his or her decision will not be disturbed on appeal *unless manifestly erroneous*."[6] "'Manifest error' is one that is 'plain and indisputable, and that amounts to a complete disregard of the controlling law.'"[7] If this Court finds an abuse of discretion, it must then conduct a harmless error analysis and "affirm[] the judgment, unless the ruling affected substantial rights of the complaining party."[8]

---

[4] There is complete diversity between the parties, as Plaintiffs are both Texas residents, and Honda is a resident of Canada. The amount in controversy exceeds $75,000.

[5] *Hodges v. Mack Trucks, Inc.*, 474 F.3d 188, 194 (5th Cir. 2006).

[6] *Id.* (emphasis in original) (citation omitted).

[7] *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 802 (5th Cir. 2018) (citation omitted).

[8] *Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007) (citation omitted).

By contrast, this Court reviews a district court's denial of a JMOL motion de novo, and it applies the same deferential standard as the district court does in reviewing the jury's verdict.[9] A JMOL "is proper only when 'a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue.'"[10] This standard is met only "if the facts and inferences point so strongly and overwhelmingly in the movant's favor that jurors could not reasonably have reached a contrary verdict."[11] In other words, this Court will not reverse the denial of a JMOL motion unless there is no "substantial evidence" to support the verdict, "or if the legal conclusions implied from the jury's verdict cannot in law be supported by those findings,"[12] as courts of appeal are "wary of upsetting jury verdicts."[13] When evaluating whether there is substantial evidence to support the verdict, this Court "must consider all of the evidence in the light most favorable to the nonmovant, drawing all factual inferences in favor of the non-moving party, and leaving credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts to the jury."[14]

---

[9] *Janvey v. Dillon Gage, Inc. of Dallas*, 856 F.3d 377, 384 (5th Cir. 2017).

[10] *Id.* (quoting *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013)); FED. R. CIV. P. 50(a).

[11] *Abraham*, 708 F.3d at 620 (citation omitted).

[12] *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 499 (5th Cir. 2012) (citations omitted). "Substantial evidence is defined as evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Threlkeld v. Total Petroleum, Inc.*, 211 F.3d 887, 891 (5th Cir. 2000) (citing *Gaia Techs. Inc. v. Recycled Products Corp.*, 175 F.3d 365, 374 (5th Cir. 1999)).

[13] *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1039 (5th Cir. 2011); *Abraham*, 708 F.3d at 620.

[14] *Price v. Marathon Cheese Corp.*, 119 F.3d 330, 333 (5th Cir. 1997) (citations omitted).

No. 22-40790

## III.

Plaintiffs asserted a design defect claim, which required them to prove: "(1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery."[15] A safer alternative design exists if an alternative design "would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without substantially impairing the product's utility," an element Honda calls "risk-utility."[16] At trial, Plaintiffs offered Ziejewski's and Hannemann's testimony as evidence of these elements. Honda contends the district court erred by failing to exclude Plaintiffs' two experts. We disagree.

## A.

This Court applies the Federal Rules of Evidence ("FRE") to evaluate questions of admissibility, reliability, and competency of evidence.[17] Regarding expert evidence, the district court serves as a gatekeeper to ensure that scientific evidence is relevant and reliable.[18] Parties offering expert testimony must prove the expert is qualified and will offer relevant and reliable testimony.[19]

---

[15] *Goodner*, 650 F.3d at 1040 (citing *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 311 (Tex. 2009)).

[16] TEX. CIV. PRAC. & REM. CODE § 82.005(b)(1).

[17] *Wackman v. Rubsamen*, 602 F.3d 391, 400 n.2 (5th Cir. 2010).

[18] *Daubert*, 509 U.S. at 590–93; *Atlantic Specialty Ins. Co. v. Porter, Inc.*, 742 F. App'x 850, 852 (5th Cir. 2002).

[19] *Daubert*, 509 U.S. at 590–91.

Under FRE 702, a person may be "qualified as an expert by knowledge, skill, experience, training, or education" if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.[20]

Courts deciding whether to admit expert testimony may also consider additional relevant factors.[21] In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the Supreme Court offered the following, non-exclusive list of factors that courts may use when evaluating the reliability of expert testimony: (1) whether the expert's theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error of the challenged method; and (4) whether the theory or technique is generally accepted in the relevant scientific community.[22] The courts must focus "on [the expert's] principles and methodology, not on the conclusions that they generate."[23] However, the *Daubert* factors are not "a definitive checklist or test," and the

---

[20] FED. R. EVID. 702.

[21] *Daubert*, 509 U.S. at 594.

[22] *Id.* at 593–94.

[23] *Id.* at 595.

No. 22-40790

analysis is "flexible."[24] As a result, the district court has discretion under *Daubert* to allow or exclude experts from testifying.[25]

**B.**

Before trial, Honda moved to exclude Ziejewski and Hannemann on several grounds. First, Honda argued Ziejewski's testimony was not reliable because he "failed to perform a risk-utility analysis" independently and, instead, relied on and co-signed Neil Hannemann's alternative designs analysis. Second, Honda said Hannemann's testimony should be excluded because he also failed to perform a risk-utility analysis. Finally, Honda claimed that Hannemann offered no evidence the proposed alternative designs were economically feasible.

The district court denied both motions. Regarding Ziejewski, the court held that Honda's complaint "attacks the merits of the design defect claim," not Ziejewski's reliability as an expert witness. In other words, the court explained that Ziejewski's testimony was one way Plaintiffs hoped to establish the existence of a safer alternative design, but it was not the only method available, and Ziejewski's testimony did not itself need to meet the preponderance standard to be admissible. Instead, the jury would decide how much, if any, weight to assign his testimony.

The district court also denied Honda's motion to exclude Hannemann, finding Hannemann sufficiently reliable. The district court noted that although Hannemann did not perform his own crash tests, Hannemann "rests his opinion on tests performed by reputable agencies, including the Insurance Institute for Highway Safety, the National Highway

---

[24] *Id.* at 594–95.

[25] *St. Martin v. Mobil Expl. & Producing U.S., Inc.*, 224 F.3d 402, 405 (5th Cir. 2000) (citations omitted).

No. 22-40790

Safety Administration, and other vehicle manufacturers." The court also considered that Hannemann inspected the accident vehicle, reviewed literature and patents, and "relied on the automotive literature on testing reverse geometry belts with a load limiter without serious neck injuries and reviewed automotive literature and Honda's internal documents which showed that a specific type of seatbelt would be effective means to prevent far-side impacts." Ultimately, the district court held that Honda's "argument attacks the merits of the design defect" claim, as it "rests on an element that Plaintiffs must prove under Texas law to succeed on a design defect claim—that a safer alternative existed." Thus, the court determined that, despite Honda's critique of Hannemann's methods and conclusions, it was the jury's province to "determine the weight and credibility, if any, to assign to Hannemann's opinion."

## C.

The district court did not abuse its discretion by denying Honda's motions to exclude the expert testimony from Ziejewski or Hannemann.[26]

On appeal, Honda makes two central arguments that the district court erred by admitting Ziejewski's testimony. First, Honda contends Ziejewski's

---

[26] In addition, Plaintiffs argue that this Court should review the propriety of the district court's decision to admit the experts by reviewing the record in its entirety—including post-*Daubert* testimony. They cite *Hodges v. Mack Trucks* for this proposition, arguing this Court in that case conducted a "review of the record" to decide whether it was manifestly erroneous to admit the expert testimony. *Hodges*, 474 F.3d at 195. This interpretation is incorrect. The scope of the "record" considered by the Court in that case is unclear. In fact, there is no evidence this Court reviewed post-*Daubert* testimony when deciding whether the district court was correct in *Hodges*. And in *Tanner v. Westbrook*, this Court reviewed a *Daubert* denial by considering only "the materials the trial court had before it." 174 F.3d 542, 546 (5th Cir. 1999), *superseded in part by rule on other grounds*, FED. R. EVID. 103(a). Therefore, this Court will review the district court's decision to admit the experts' testimony by considering only the evidence before the district court.

testimony about the existence of "safer alternative designs" should have been excluded because his opinions were conclusory and unsupported. Specifically, because Ziejewski did not conduct a formal risk-utility analysis and relied on Hannemann's testing analysis instead of conducting his own, Honda argues Ziejewski could not show that the proposed alternative designs would have likely prevented the injuries. Second, Honda argues the district court "did not analyze relevancy and reliability."

These arguments are unconvincing. The district court did not abuse its discretion when it found Ziejewski did more than "co-sign" Hannemann's claims. It analyzed the relevancy, reliability, and potential helpfulness of Ziejewski's report, which indicated that Ziejewski applied principles of accident reconstruction, biomedical engineering, and body kinematics to the facts of the case. The district court found, for example, that Ziejewski applied his "education, training, and experience" in body kinematics, "engineering principles and methodologies generally accepted," and biomechanics to explain that "[t]he alternative seatbelt designs would not have allowed Mr. Kim's shoulder slip-out and would have prevented excursion of his head, neck, and upper torso from the safety of his seat," and that "[a] center airbag, side impact containment, and offset packaging would have provided an effective means of preventing occupants' head impact with one another." Moreover, Honda's complaint that Ziejewski failed to conduct a formal risk-utility analysis speaks to a question of substantive law—not the requirements of FRE 702.[27] Ultimately, it is not difficult to imagine how these findings could be helpful to the jury when assessing whether proposed alternative designs would have prevented the injuries at issue.

––––––––––––––––––

[27] *See infra* Section IV (describing the substantive requirements for a product liability defective design case). This requirement, however, is not part of the admissibility analysis under FRE 702 or *Daubert*.

No. 22-40790

Next, regarding Hannemann: on appeal, Honda makes three arguments to support its claim that the district court abused its discretion in admitting his expert testimony. Honda emphasizes Hannemann's (1) failure to perform a formal "risk-utility analysis" and urges that he (2) failed to prove the alternative designs would have produced a better outcome in the accident at issue. Honda also contends (3) Hannemann should have been excluded because he "offered only conclusory opinions about the economic feasibility of the proposed alternatives."

These contentions are not persuasive given the high degree of deference this Court gives to evidentiary rulings. First, Honda's complaint that Hannemann failed to conduct a formal risk-utility analysis is relevant to the substantive requirements for relief, not the admissibility of expert testimony. Second, Hannemann's report included sufficient information for the district court to find he could provide reliable testimony about whether an alternative design could lead to a better outcome. The report was thorough and relied on Hannemann's 40 years of experience in automotive engineering, design, and crash testing. Hannemann detailed how he personally inspected the Kims' vehicle, followed accepted scientific testing methods, relied on reputable agencies' methods of testing, and applied his engineering judgment to the facts of the case. As such, the district court did not commit "manifest error" in finding Hannemann met FRE 702. Hannemann's perspective on automotive design and expertise in engineering could help the jury understand the nature of the accident; the testimony is based on sufficient facts and data (e.g., inspecting the vehicle, reliable studies, and relevant tests); and he used and applied reliable and accepted methods of engineering analysis to form his conclusions.

Third, we reject Honda's contention that Hannemann provided only conclusory evidence of economic feasibility. Hannemann said reverse geometry seatbelts likely cost "next to nothing" if a manufacturer has

12

No. 22-40790

"already committed to an ABTS [all belts to seat] seat design," which is used in the rear seats of other vehicles.[28] And Honda's corporate representative stated in his deposition that "the Honda airbag would cost less than the one [General Motors] made in 2013." Thus, Honda cannot plausibly claim that Hannemann offered only conclusory statements when its own expert confirmed the substance of Hannemann's statement. At bottom, Hannemann had decades of experience in automotive engineering and applied that expertise to opine that the alternative designs would have reduced the likelihood of injury in this accident and would not be cost prohibitive, testimony meeting FRE 702 and *Daubert*.

**IV.**

Next, Honda argues the district court erred by denying its JMOL motion. Again, we disagree.

To succeed on a design defect claim in Texas, "a plaintiff must prove that (1) the product was defectively designed so as to render it unreasonably dangerous; (2) a safer alternative design existed; and (3) the defect was a producing cause of the injury for which the plaintiff seeks recovery."[29] A safer alternative design refers to:

> a product design other than the one actually used that in reasonable probability:
>
> (1) would have prevented or significantly reduced the risk of the claimant's personal injury, property damage, or death without *substantially impairing* the product's utility; and
>
> (2) was *economically and technologically feasible* at the time the product left the control of the manufacturer or seller by the

---

[28] Hannemann provided more exact costs for each alternative design at trial.

[29] *Goodner*, 650 F.3d at 1040.

application of existing or reasonably achievable scientific knowledge.[30]

In its initial JMOL motion and its motion for a new trial, Honda argued Plaintiffs failed to prove all elements of their design defect claims. On appeal, Honda has focused its argument on the district court's denial of its JMOL motion and, specifically, on whether there was sufficient evidence to establish a safer alternative design. Honda attacks both prongs of the "safer alternative design" analysis, arguing: (1) "Plaintiffs' two liability experts offered no 'substantial' evidence as support for a safer alternative design, but instead (a) did not perform the required risk-utility analysis, and (b) ultimately offered only their mere *ipse dixit* about whether the two alternatives would have prevented the injuries *in this crash*[;]"[31] and (2) Hannemann provided only conclusory opinions about the economic feasibility of the two alternative designs—a center airbag and a reverse geometry seatbelt.

## A.

Honda argues there was insufficient evidence for the jury to find that either alternative design would prevent or significantly reduce the risk of Plaintiffs' personal injuries without substantially impairing the CR-V's utility. Honda first asserts that Texas law required Plaintiffs to conduct a formal "risk-utility analysis" and then claims there was insufficient evidence that either design—the center airbag or the reverse geometry seatbelt— would have likely reduced the risk of injury.

---

[30] TEX. CIV. PRAC. & REM. CODE § 82.005(b) (emphasis added).

[31] Although Honda did not contest the feasibility of either alternative design (center airbags or reverse geometry seatbelts), it did not stipulate to feasibility, so the Plaintiffs still had the burden to introduce sufficient evidence of feasibility at trial.

**1.**

First, Honda argues that *Casey v. Toyota Motor Engineering & Manufacturing North America, Inc.*[32] added what is essentially a sub-requirement to prong (1): that the expert "perform a risk-utility analysis of the proposed alternative." This argument overstates Plaintiffs' burden.

Texas law requires plaintiffs demonstrate that the "safety benefits from [the] proposed design are foreseeably greater than the resulting costs, including any diminished usefulness or diminished safety."[33] But this Court has held that "[t]he burden is minimal: plaintiffs need only offer '*some* evidence that their alternative design . . . would not have introduced other dangers of equal or greater magnitude.'"[34] In *Sims v. Kia Motors of America, Inc.*, for example, this Court analyzed an expert's statements—"the use of a fuel tank shield would not have hindered the performance of the vehicle" and "the benefits [of the fuel tank shield] far outweigh any impairment in utility"—along with the expert's acknowledgement of a potential minor impairment, and said these statements would "probably meet [the] minimal burden to show the risk-utility of the alternative designs."[35] By contrast, alternative designs that would "eliminate whole categories of useful products from the market" in the name of increasing safety would likely be insufficient.[36] Thus, Plaintiffs did not need to conduct a formal risk-utility analysis to prove there was a safer alternative design available; they needed

---

[32] 770 F.3d 322 (5th Cir. 2014).

[33] *Id.* at 331 (citing *Hodges*, 474 F.3d at 196) (cleaned up).

[34] *Sims v. Kia Motors of America, Inc.*, 839 F.3d 393, 406 (5th Cir. 2016) (internal citations omitted).

[35] *Id.*

[36] *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 385 (Tex. 1995).

only to offer some evidence the center airbag or reverse geometry seatbelt would not have significantly increased the risk of injury or impaired utility.

**2.**

Second, Honda argues Plaintiffs put forth insufficient evidence that the center airbag design would have likely reduced the risk of injuries in this crash without overly sacrificing the CR-V's utility. This argument is not persuasive. There was sufficient evidence for the jury to find Honda liable for not installing a center airbag. Of course, that other manufacturers have installed the missing reverse geometry seatbelt and center airbag is itself evidence of risk-utility. But there is more.

Hannemann offered sufficient evidence of the center airbag's promise—as well as its relevant risks and potential impact on utility. He testified the center airbag could be installed in the front of the car, on either the driver's or passenger's side (or both). Hannemann further illustrated how the center airbag would inflate and protect occupants in a far-side impact such as the one that occurred in this case. Then, he showed how these features would have reduced the risk of injury in this case by relying on work and crash tests that General Motors and Takata performed when designing, testing, and installing a front center airbag in their 2013 vehicles.

In particular, Hannemann testified that a side impact accident would cause a front center airbag to "deploy[] outward initially" and then to "wrap around the driver" as he moves into it, causing "cushioning between the driver and front passenger" to prevent their heads from striking. Importantly, Hannemann explained that this alternative design "would have prevented [Su Min's] serious injury" because the "configuration and severity" of the accident were below the parameters of testing by the Insurance Institute for Highway Safety, meaning that the crash should have been "a survivable accident without serious injury." And Hannemann

explained (and Honda's corporate representative admitted) that "prior to the manufacturing of the 2014 Honda CR-V," it did not "run a side impact test with a far side crash test dummy in the test vehicle." This testimony provided a basis for the jury to find Honda did not sufficiently test or design its CR-V to account for this accident, which should have survivable without serious injury.

Next, Honda argues the General Motors testing on which Hannemann relied was unreliable and insufficient for two reasons. First, it argues the testing did not "correlate to the circumstances of the subject accident," and that, if anything, the testing showed only a "possible benefit" in a "purely lateral" side impact such that the testing cannot support the verdict. This argument is unconvincing. Plaintiffs presented evidence that General Motors conducted multiple tests under different crash modes that, by implication, addressed the circumstances of this crash, as it was "pretty typical." Thus, there was sufficient evidence for the jury to "conclude that [General Motors] would not have designed, tested, patented, and equipped its vehicles with a center airbag that would protect occupants from head-to-head contact in just one crash mode."

Second, Honda contends Hannemann could not rely on the General Motors testing because he did not know the size, timing, or fill rate of the airbag used in the studies. But this assertion also fails. Hannemann said the airbag was "fairly tall" and extended "from the lowest part of the seat all the way to the top," while Honda's own experts' testimonies showed that the center airbag in those tests would deploy and fill in about 61 milliseconds—well before Ji Hun moved to the passenger's side of the CR-V at approximately 90-105 milliseconds. Moreover, Honda's testing, as well as Hannemann's testimony, addressed the potential risk that the airbag would not be fully tethered and would allow the driver's head to slide past the airbag into the passenger's space.

Lastly, Hannemann presented sufficient evidence about the utility of the center airbag alternative design. He explained that installing the airbag would not reduce the utility of the CR-V because "until there is a crash that signals it . . . you wouldn't even know it's there." Hannemann also addressed concerns that occupants could be injured when the center airbag inflates, citing his automotive engineering experience and General Motors' testing and published articles. Honda's expert agreed, explaining that General Motors addressed these concerns by having the center airbag delay shortly after the initial airbag deployment to avoid injuries.

In sum, Honda's contentions that the center airbag evidence is insufficient are meritless and address the weight of the evidence, not its sufficiency. Honda raised these arguments during proceedings before the district court. It failed to persuade the jury, the district court, and this Court.

**3.**

Third, Honda attacks the sufficiency of Plaintiffs' evidence that a reverse geometry seatbelt would, in reasonable probability, significantly reduce the risk of Su Min's injury without substantially impairing the CR-V's utility. This argument fails for reasons similar to Honda's contentions about the sufficiency of evidence of the center airbag design.

As the district court noted, "Hannemann and Ziejewski discussed in detail the purpose and engineering behind reverse geometry seatbelts." They explained the relevant risks, the potential impact on utility, and the benefits of the reverse geometry seatbelts. To start, the experts used demonstrations and 3D animations to show the jury how reversing the direction of the seatbelts—such that the shoulder belt crosses over the driver's right shoulder, and the passenger's left shoulder—would "prevent[] the driver[] from slipping out of the belt, and restrain[] them" during a far-side impact.

No. 22-40790

Hannemann also testified that these alternative seatbelts have undergone "a significant amount of testing" and have been installed on Dodge Vipers, an experimental Honda vehicle, and in the rear seats of BMWs. Although one of the tests supporting Hannemann's opinion involved a rollover and not a T-bone crash, Hannemann concluded that the reverse seatbelt would still provide the same benefits in the Kims' side-impact crash because "the non-leading side occupant [in a rollover crash] . . . would be similar to the person on the far side" of a side impact, as the same forces would "make [the occupant] slip out of the belt." Hannemann's testimony and the studies on which he relied provided sufficient evidence for the jury to find that the reverse geometry seatbelt design would have prevented or reduced the risk of Su Min's injury. As the Plaintiffs explain:

> To prevent or reduce the risk of the head-to-head contact that caused Su Min's injury, the reverse geometry seatbelt on the driver's side only needed to restrain Ji Hun's upper torso just enough to restrict his head from moving all the way into Su Min's passenger space. And the evidence established a reasonable probability that a reverse geometry seatbelt would have done just that, especially in light of Hannemann's further testimony that the "configuration and severity" of this accident were below the parameters of IIHS's testing and the accident was therefore "survivable . . . without serious injury."

On appeal, Honda argues the reverse geometry seatbelts would impair the CR-V's utility because they could (1) cause neck injuries; (2) allow an occupant to move toward the near-side impact; (3) be rejected by the public; (4) cause the buckle to open in a near-side impact; or (5) require the installation of all-belts-to-seat systems, which have their own disadvantages. But there was sufficient evidence for the jury to find that all of these concerns could be mitigated or outweighed by the benefits of the alternative design.

19

First, Hannemann explained that load limiters can "eliminate" the risk of neck injuries from these reverse geometry seatbelts. He also detailed how the CR-V's door panels and side curtain airbags would prevent occupants from slipping out and protect them from near-side impacts, and that conventional seatbelts do little to address this concern, so that "you're not really losing any protection" by installing reverse geometry seatbelts. Furthermore, Hannemann noted that reverse geometry seatbelts have been used for decades and that public rejection is not a significant risk because the belts use "the same type of ergonomics" as conventional seatbelts. This opinion was based on Hannemann's engineering judgment and decades of automotive design experience, as well as a published paper authored by BMW in 1987 that describes increased belt usage from reverse geometry seatbelts in backseats. Hannemann also addressed Honda's fourth concern, explaining that buckle designs have improved and that there have been no reports of any issues with the buckles' locations in BMW's vehicles that have reverse geometry seatbelts.[37] Lastly, Hannemann addressed the potential disadvantages of an all-belts-to-seat system (which is required to mount reverse geometry seatbelts), explaining there were also significant advantages—i.e., "[t]he seatbelt . . . moves with you as you adjust the seat" while the belt remains in the "optimal location." He also said these seats have been produced since the late 1990s, and the risks associated with them have been addressed.

Considering this evidence in the light most favorable to the Kims, there is sufficient evidence for the jury to find that both the reverse geometry seatbelt and the center airbag would be a safer alternative within the meaning

---

[37] Notably, Honda's expert acknowledged the buckle is "designed to overcome some compressive forces" and doubted it "would release from accelerations."

of § 82.005(b). Thus, the district court was correct to deny Honda's motion for a JMOL.

## B.

Additionally, Honda challenges whether Plaintiffs provided sufficient evidence for the jury to determine that either alternative design—the center airbag or reverse geometry seatbelt—was economically and technologically feasible.

After reviewing the record, this Court finds Plaintiffs presented sufficient evidence to allow a reasonable juror to find there were feasible, available alternative designs. Hannemann opined that Honda could install the airbag in the CR-V because the center airbag had already been used in three vehicles manufactured by General Motors (which Honda's expert acknowledged on cross-examination) and would cost only twenty to thirty dollars per vehicle. Hannemann further testified that using reverse geometry seatbelts was also feasible: the seatbelt had been tested in the 1970s and 1980s, and it had been used in the front seats of a late 1990s BMW vehicle (as well as in the rear seat of a pre-2014 vehicle). Finally, Hannemann explained that adding the seatbelts, along with the required all-belts-to-seat design, would increase the cost of each vehicle by only about thirty dollars.

This evidence, considered in the light most favorable to the Plaintiffs, is sufficient for the jury to find at least one of these alternative designs economically and technologically feasible. While Honda may dispute the cost of these alternatives, it may not plausibly claim there was insufficient evidence.

## V.

Finally, Honda argues the district court erred in finding the Texas presumption of nonliability inapplicable and not instructing the jury about it.

No. 22-40790

To be clear, Texas tort law provides a rebuttable presumption of nonliability in certain product liability actions:

> In a products liability action brought against a product manufacturer or seller, there is a *rebuttable presumption* that the product manufacturer or seller is not liable for any injury to a claimant caused by some aspect of the formulation, labeling, or design of a product if the product manufacturer or seller establishes that the product's formula, labeling, or *design complied with mandatory safety standards or regulations adopted and promulgated by the federal government*, or an agency of the federal government, *that were applicable to the product at the time of manufacture* and that *governed the product risk that allegedly caused harm.*[38]

The last portion of the presumption—that there were federal standards governing the product risk allegedly causing the harm—was the only one disputed at trial. Meeting this element is a prerequisite to receiving a jury instruction about the presumption: defendants are not entitled to the instruction if they fail to establish "compliance 'with mandatory [federal] safety standards . . . that governed the product risk that allegedly caused the harm.'"[39] The task is identifying the product risk and any connection to federal safety standards, as the Texas legislature's purpose in enacting the presumption was to address situations where "manufacturers and sellers were being held liable in products liability cases even though the products at issue complied with all *applicable* federal safety standards."[40]

---

[38] TEX. CIV. PRAC. & REM. CODE ANN. § 82.008(a) (emphasis added).

[39] *Trenado v. Cooper Tire & Rubber Co.*, 465 F. App'x 375, 379 (5th Cir. 2012) (per curiam) (unpublished) (citing TEX. CIV. PRAC. & REM. CODE § 82.008(a)).

[40] *Kia Motors Corp. v. Ruiz*, 432 S.W.3d 865, 869 (Tex. 2014) (emphasis added). Once the presumption is found applicable, it may be rebutted if plaintiffs show either "(1) the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage; or (2) the

No. 22-40790

Treating the applicability of the presumption as a question of law, the district court defined the product risk allegedly causing Plaintiffs' injuries as "the risk of injury from a far-side impact during a near-side collision," finding no federal standard applied (governed the product risk as defined by the district court). The district court denied Honda's requested jury instruction.[41]

Honda agrees that, under the district court's conception of the product risk, there is no applicable federal standard. In other words, it does not dispute that the presumption is inapplicable given the district court's definition of the product risk. Nonetheless, on appeal, Honda argues (1) the jury, not the district court, should have decided whether the presumption applied; and (2) the district court erred by defining the product risk narrowly.

After reviewing the statutory text, the precedent of this Court, and Texas state court case law, this Court finds the district court committed no

---

manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action." TEX. CIV. PRAC. & REM. CODE § 82.008(b).

[41] Honda's requested jury instructions read:

You are entitled to presume that American Honda is not liable for any injury to the Plaintiffs if the evidence establishes that the 2014 Honda CR-V complied with mandatory safety standards or regulations adopted and promulgated by the federal government, or an agency of the federal government, that were applicable to the 2014 Honda CR-V at the time of its manufacture that governed the product risk that allegedly caused harm.

Plaintiffs may rebut the presumption by evidence establishing that (1) the mandatory federal safety standards or regulations applicable to the product were inadequate to protect the public from unreasonable risks of injury or damage; or (2) the manufacturer, before or after marketing the product, withheld or misrepresented information or material relevant to the federal government's or agency's determination of adequacy of the safety standards or regulations at issue in the action.

23

error. The district court was correct to treat the instruction's applicability as a question of law, to define the product risk in a case-specific way, and to rule the presumption inapplicable because no federal standard governed the appropriately-defined product risk at issue.[42]

## A.

To start, Honda's assertion that the jury, not the court, should have decided whether the presumption applies is meritless. Honda relies on three intermediate appellate cases to support its contentions, but these arguments are foreclosed by the Texas Supreme Court's holding in *Kia Motors Corporation v. Ruiz*, to which this Court must adhere.

*Kia* illustrates the principle that whether the statutory presumption is applicable is a question of law.[43] The *Kia* court thoroughly analyzed the statute, the product risk, and potential federal regulations before holding that no federal standard governed the product risk, such that the presumption was inapplicable.[44] Its discussion made no mention or insinuation that these questions were fit for a jury. Moreover, the court decided to review the applicability of the presumption de novo, further supporting the conclusion

---

[42] Parties have offered competing standards of review for these questions. Plaintiffs assert this Court should apply an abuse of discretion standard, as this Court reviews preserved claims of errors in jury instructions for an abuse of discretion. *See Wright v. Ford Motor Co.*, 508 F.3d 263, 268 (5th Cir. 2007). Honda argues the Court should apply two standards: de novo review as to whether the presumption applies (considering the question to be one of statutory interpretation) and abuse of discretion as to whether the district court erred by not instructing the jury about the presumption. *See, e.g., Janvey*, 856 F.3d at 388 ("Jury instructions are reviewed for abuse of discretion. . . . Instructions that hinge on a question of statutory construction are reviewed de novo."). Under either standard, Honda's arguments fail.

[43] *Kia*, 432 S.W.3d at 869–74.

[44] *Id.*

No. 22-40790

that the question is one of law.[45] Thus, Texas treats the question of whether the presumption applies as one of law, and we must do so here.[46]

Moreover, this Court's analysis in *Wright v. Ford Motor Company* tacitly supports this conclusion.[47] In *Wright*, this Court analyzed whether the presumption was applicable and then explained that a "fact question as

---

[45] *Id.* at 869.

[46] Although not binding on this Court, we address the three cases Honda cites (erroneously) to support its contentions. First, Honda cites *Trenado v. Cooper Tire Rubber & Co.*, an unpublished case in this Circuit where the district court submitted a jury instruction about the presumption that allowed the jury to decide whether it applied. 465 F. App'x at 378–80. But *Trenado* is not instructive: it does not speak to whether, as a matter of law, it was correct for the jury to decide the statute's applicability. Instead, the plaintiffs failed to object on the ground that no federal standard governed the product risk, triggering only a plain error review of that question. *Id.* This Court found it was not plain error to submit the instruction because the product risk was expressly governed by a federal standard.

Second, Honda misreads *Hamid v. Lexus*, where the Court of Appeals of Texas held that "[u]nder the plain language of Section 82.008(a) . . . the threshold determination of whether the presumption applies turns on the relevant product risk, not the particular defect alleged by the plaintiff." *Hamid v. Lexus*, 369 S.W.3d 291, 300 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Honda claims *Hamid* shows that the applicability of the presumption can be a jury question because the court affirmed the jury instruction that included the presumption. However, Honda overlooks that the question before the Texas appellate court was whether the product *risk* or the product *defect* controls the applicability of the presumption, not *when* the jury is to receive an instruction about the presumption or *what* is fit for the jury to decide. *Id.* at 296–97. It is true that the trial court in *Hamid* provided the jury with an instruction allowing it to decide whether the presumption applied, but that decision is neither binding nor persuasive on this Court.

Third, Honda's reliance on *American Honda Motor Co. v. Milburn* is misplaced. No. 05-19-0850-CV, 2021 WL 5504887, at *4 (Tex. App.—Dallas Nov. 24, 2021, pet. granted) (mem. op.). In that case, the trial court did allow the jury to decide whether the presumption was met; however, this unpublished opinion is not binding on this Court. *Id.* Moreover, the parties in *Milburn* did not assert on appeal that the question should have been left for the courts, so the state court did not address that question. *Id.* at *12–17.

[47] 508 F.3d at 274.

*whether* the presumption *has been rebutted* will be submitted to the jury."[48] This approach implies that whether the presumption is applicable is a question of law for the court, and whether the presumption has been rebutted is a question of fact for the jury.

### B.

Honda further attacks the district court's definition of the product risk. Honda argues the product risk should have been defined as "the risk of injury in a side-impact collision." The district court rejected Honda's definition, opting instead for a more specific one: "the risk of injury from a far-side impact during a near-side collision." After reviewing Texas precedent and this Circuit's case law, we find no error in the district court's analysis.

This Court has addressed the presumption directly in two cases, and in each, the Court has looked carefully at how the issue and risks were framed throughout the litigation. First, in *Wright*, the Plaintiffs filed a product liability wrongful death and survival action against Ford, arguing that a design and manufacturing defect caused their son's death.[49] The Court found that "[t]he risk that caused the harm and forms the basis of the Wrights' suit is the rear blindspot" of the vehicle.[50] Second, this Court in *Trenado* considered the different federal standards at issue, and how the witnesses and parties

---

[48] *Id.* (second emphasis added); *see also Trenado*, 465 F. App'x at 379 (noting that a defendant is not entitled to the presumption unless the defendant illustrates adherence to "mandatory [federal] safety standards . . . that governed the product risk that allegedly caused the harm."). *Wright* and *Trenado* suggest that the court, not the jury, must decide whether a defendant is entitled to a jury instruction that provides the rebuttable presumption.

[49] 508 F.3d at 266.

[50] *Id.* at 270.

framed the relevant risks and defects, in order to properly define the product risk.[51] It found the risk that caused the harm was "tire failure" related to durability, rather than the Plaintiff's suggestion of the tire's "undue propensity for late-life catastrophic tread separation failure."[52]

District courts in this Circuit have also conducted a fact-intensive inquiry to identify the relevant product risk, and they have considered the nature and purposes of different federal standards at issue when determining how to define the risk. In *Hinson v. Dorel Juvenile Group, Inc.*, the court held the product risk causing injuries to Hinson's child riding in a forward-facing car seat was the "'potential risk of enhanced and serious injury to very young children resulting from being positioned in the subject forward facing car seat' as opposed to a rear-facing car seat" instead of "injury for a child in forward versus rear-facing car seats, as well as the seating criteria for that risk."[53] And in *Ramos v. Stellantis North American*, the court held the product risk was "fire spread[ing] into the passenger compartment at a rate that prevented the occupants from safely exiting the vehicle" rather than "fire entering the vehicle from outside via the rear vent flap."[54]

Texas courts have also preferred case-specific conceptions of product risk. In *Kia*, a Texas Court of Appeals reviewed the legislative history of the statute and held that the legislature did not intend to create overly broad constructions of risk.[55] In doing so, it determined that the product risk in the

---

[51] 465 F. App'x at 380. Notably, this Court in *Trenado* applied only a plain error standard of review.

[52] *Id.* at 379–81.

[53] No. 2:15-CV-713-JRG-RSP, 2016 WL 3361480, at *2–3 (E.D. Tex. June 9, 2016).

[54] No. 2:21-CV-00099, 2022 WL 3595140, at *11 (S.D. Tex. Aug. 2, 2022).

[55] 348 S.W.3d 465, 471–475 (Tex. App. 2011), *rev'd on other grounds*, 432 S.W.3d 865 (Tex. 2014).

case was "the failure of a frontal airbag to deploy" and not the broader "risk of occupant injury in a crash."[56] It adopted a case-specific description of the risk that specified *how* a person may be harmed by a design defect.[57]

Case-specific definitions of the product risk also comport with the statutory language, which calls for the court to consider the specific "product risk that allegedly caused harm" in a given action.[58] As explained in *Kia*: "the plain language of [S]ection 82.008 requires that a safety regulation govern product *risk*, not a particular product *defect*," and the court "must closely examine both the product risk arising from an alleged design defect and the parameters of the regulation at issue in evaluating whether the manufacturer's compliance with that regulation entitles it to a presumption of nonliability to an injured claimant."[59]

*Kia*, as well as other case law previously discussed, support the district court's fact-specific definition of product risk. Indeed, characterizing the risk as "injury in a side-impact collision" (as Honda requests) disregards the crux of this case: Plaintiffs presented unrefuted evidence that the side-impact collision itself was *not* the cause of Su Min's injuries, and that restraint systems addressing the risk of side-impact collisions (e.g., the side structure, the side airbags, the door panel, and the passenger's seatbelt) performed properly and were not defective. Rather, the injuries were the result of a far-side impact—Ji Hun's head hitting Su Min's head. These injuries align closely with the district court's careful description of the product risk. Moreover, characterizing the risk as broadly as Honda argues would

---

[56] *Id.*

[57] *Id.*

[58] TEX. CIV. PRAC. & REM. CODE § 82.008(a).

[59] 432 S.W.3d at 873–74.

erroneously allow the presumption "to apply in every case involving any type of side-impact collision, regardless of plaintiff's alleged harm," in direct contradiction to the text of the statute that emphasizes a consideration of the plaintiff's harm in every application. Finally, it signifies that before this accident other manufacturers had seen this risk and made the needed changes—that is, the industry, Honda apart, had seen the very risk that brought the horrific injuries here.

## C.

After defining the product risk to reflect the cause of harm and the specific facts at issue here, the next step in the analysis is to consider whether there is a federal regulation or standard that governs the risk. The answer is no.

*Kia* is instructive. After first defining the product risk narrowly, the Texas Supreme Court then sought an *equally specific* federal standard that would govern that risk.[60] It found, ultimately, that "[n]othing in [the federal standard] suggests a purpose of reducing the likelihood of an air bag's failure to deploy under circumstances in which everyone agrees it should have deployed," so no federal standard governed the product risk, and the presumption thus did not apply.[61]

Here, the district court was correct to conclude that no federal standard governed the product risk of a far-side impact injury during a side-impact collision. As the district court observed, "every single expert who testified at trial . . . agreed" that no federal regulation or standard is "designed to protect the near-side occupant in a collision from far-side

---

[60] *Id.*

[61] *Id.* at 874.

impact injuries." This assessment even includes Honda's corporate representative, who agreed on cross-examination that there are no government standards requiring manufacturers to design technologies addressing countermeasures for far-side impact injuries or to address the risk of occupant-to-occupant injuries in a side impact. Despite these admissions, the district court still evaluated four potential federal standards and ruled that none "govern the product risk at issue." Specifically, it engaged in a comprehensive analysis of Federal Motor Vehicle Safety Standards 208, 210, 211, and 214 before finding that none addressed the risk of a far-side impact injury in a side-impact crash; instead, they were focused on, *inter alia*, seat belt failure, front-crashes, assembly anchorages, and side doors.

Because there is no applicable federal standard that applies to the properly defined product risk, the district court properly rejected the instruction about the presumption.

\* \* \* \* \*

Honda attempts to escape this jury verdict by arguing the district court erred in three ways: by admitting Plaintiffs' experts, denying its JMOL motion, and denying its proposed instruction about the nonliability presumption. But it is incorrect on all fronts. The Plaintiffs' experts based their opinions on reliable methodologies and provided relevant, helpful testimony. As such, there was sufficient evidence for the jury to find Honda liable for the Kims' injuries. The district court's application of the Texas statutory presumption of nonliability was also faithful to the statutory text, the precedent of Texas, and the precedent of this Court. We AFFIRM.